## No. 2639.—JOSEPH B. HUBBARD *v.* SUSAN D. MOORE.

A dealer in furniture or other articles of commerce has the right to trade with and make sales of furniture to a person engaged in keeping a house of prostitution, and the courts will enforce such right by compelling the person who purchases the furniture to pay for it, although it be shown that the vendor knew at the time of the sale the use to which the furniture was to be applied.

APPEAL from the Fifth District Court, parish of Orleans. *Cooley, J. L. Madison Day,* for plaintiff and appellant. *J. Ad. Rozier* and *M. Du Buisson,* for defendant and appellee.

TALIAFERRO, J. The plaintiff sues for $2167 15, with interest, being an alleged balance due him of the price of a lot of furniture sold by him to the defendant.

The answer is a general denial. The purchase of the furniture is admitted, but the defendant avers that she purchased it to be used in a house of prostitution kept by her, and that the same was to be paid for from time to time as she might be able to do by success in business, but failing in which she is unable to discharge the debt.

She alleges that the contract entered into by her and the plaintiff in regard to the furniture is one reprobated by law and contrary to good morals.

There was judgment in the court below dismissing the plaintiff's action as of non-suit, and he has appealed.

The evidence, we think, sufficiently establishes that the plaintiff, when he sold the furniture to the defendant, was aware of her character and business, but it fails to show that in supplying her with furniture there was any intent on his part to aid or sanction her course of vice and abandonment. He lived in Cincinnati. The furniture, it seems, was sold at different times, much the larger lot of it by the plaintiff's agent in New Orleans. A portion of it was sold by the plaintiff himself when on a visit to this city. The defendant was allowed a credit to make payments, and she did pay amounts at different times, making an aggregate of $380. The plaintiff had furniture to sell, and his object was to find buyers; the money of the cyprian was as useful to him as that of any other person. That he entered into a contract with the defendant to benefit himself at the expense of morals we are by no means satisfied. The allegations of the defendant's answer, aiming to create the impression that he promoted the interests of the defendant by supplying her with furniture on terms of credit to facilitate her success in a career of vice and infamy on her part, in order thereby that he might be benefited himself, are not made good by proof. We can not attribute such a motive to him. Clearly a distinction ought to be drawn between acts done manifestly in derogation of public morals and purposely to promote vice and immorality, and acts not having such manifest purpose

or tendency, but which might remotely and indirectly be auxiliary to that object. In acts of the latter class there would be no absolute violation of public morals. A *turpis causa* would not arise in such a case to vitiate a contract in which the offense against morals would be merely conjectural. To the vicious and depraved, as well as to the good and the virtuous, belong the right to acquire the needs and comforts of a common humanity. A different doctrine would adopt the visionary notion that "there is to be no more cakes and ale." The fair dealer who by lawful contract furnishes the dissolute with the necessities and conveniences of life should not be debarred the right of enforcing payment for his goods by the effrontry of his vendee asserting in a court of justice that the things furnished were obtained for the express purpose of putting them to disreputable uses. The seller who furnishes an article adapted to a legitimate and proper purpose is not responsible in a court of morals, and much less in a court of law, for a subsequent perversion of its use by the buyer. In the case at bar it is shown that the furniture was sold at cash prices, with time given for payment. The seller, there is no doubt, knew that it was to be used in a house of ill fame, but how his knowledge of that fact involves him in the guilt of the inmates of that house, as an aider and abetter of lewdness and depravity, we think is not apparent. Although it is not shown that when he delivered the furniture he told the defendant to go her way and sin no more, it is not thence to be inferred that he encouraged her in continuing in her immoral course of life. That he contributed to enable her to continue it by selling her the furniture is too vague, hypothetical and remote to form an impediment to his recovery on the contract.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be annulled, avoided and reversed. It is further ordered that the plaintiff recover from the defendant two thousand one hundred and sixty-seven dollars and fifteen cents, with legal interest from judicial demand. It is further ordered that the plaintiff's priority of lien and privilege upon the property attached be recognized, and that the same be sold according to law and its proceeds applied to the payment of this judgment—the defendant and appellee paying costs in both courts.

———

HOWELL, J., *dissenting.* I am constrained to think that the principle on which the majority of the court base their conclusion must apply to all contracts with an immoral or illegal purpose, and that all contracts of whatever species may be enforced if one of the parties can say that he did not derive profit or benefit directly from the illicit gains or vocation. I understand that the whole doctrine of avoiding

contracts for illegality and immorality is founded on public policy, and not on the interests of the contracting parties.

This subject was elaborately reviewed by the United States Supreme Court in the case of Hanauer *v.* Doane—Wallace, and many English and American authorities cited, and in which it was said: "It is certainly contrary to public policy to give the aid of the courts to a vendor who knew that his goods were purchased, or to a lender who knew that his money was borrowed for the purpose of being employed in the commission of a criminal act injurious to society or to any of its members; and that the vendor can not be permitted to stand on the nice metaphysical distinction that although he knows that the purchaser buys the goods for a highly immoral purpose, he does not sell them for that purpose." And they quote as applicable to the subject the words of Chief Justice Eyre, in Lightfoot *v.* Tenant (1 Bos. & Pul. 551, 556), who said:

"The man who sells arsenic to one who he knows intends to poison his wife with it will not be allowed to maintain an action on his contract. The consideration of the contract, in itself good, is thus tainted with turpitude which destroys the whole merit of it. * * * No man ought to furnish another with the means of transgressing the law, knowing that he intended to make that use of them." On which Judge Story remarks: "The wholesome morality and enlarged policy of this passage make it almost irresistible to the judgment; and, indeed, the reasoning seems positively unanswerable." Story's Conflict of Laws, section 253.

It is not denied, but seems conceded, that the plaintiff in this case knew that the furniture, for the price of which he is suing, was sold for the purpose of furnishing a house of prostitution; and no one will deny that such a purpose is highly immoral and injurious to society. He has the distinction of having enabled the defendant to establish and conduct her vocation of demoralizing society and undermining the very basis of its fabric, which she could not have done, at that at least, without his aid. Can he wrap himself up in his own selfishness and heartless indifference and say, what business is that of mine? Am I the keeper of the defendant's conscience? The answer, I think, is plain: He voluntarily aids in the perpetration of a heinous wrong upon virtue, and must be taken to intend the consequences of such act.

In the case of Pearce et al. *v.* Brooks, in the Court of Exchequer (five judges), decided at the Easter Term, 1866, and reported in the Law Reports, vol. 1, p. 213, "the defendant, a prostitute, was sued by the plaintiffs, coach builders, for the hire of a brougham. There was no evidence that the plaintiffs looked expressly to the proceeds of the defendant's prostitution for payment; but the jury found that they

38

knew her to be a prostitute, and supplied the brougham with the knowledge that it would be, as in fact it was, used by her as a part of her display to attract men. Held—That the plaintiffs could not recover."

Here similar equal knowledge was had by plaintiff, and he should not recover.

The vocation of defendant was not essential to the sustenance of life. Selling her over twenty-five hundred dollars worth of furniture, on a credit, to fit up a house for the purpose known to plainti ff was something more than supplying a fellow-creature with a bed for n eces-sary sleep.

I must dissent from the reasoning and conclusion of my associates. Rehearing refused.